UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Chaney and Lorish
Argued at Virginia Beach, Virginia


JESSE LEE BARBER

MEMORANDUM OPINION[*] BY
v.       Record No. 0792-21-1             JUDGE LISA M. LORISH
                                          JUNE 14, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Robert H. Sandwich, Jr., Judge

Eric Korslund (Law Office of Eric Korslund, P.L.L.C., on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Jesse Lee Barber of abduction to obtain pecuniary benefit, robbery, and

two counts of credit card theft. We find that the evidence was sufficient to prove Barber's guilt of

abduction beyond a reasonable doubt, and we affirm his conviction.[1]

BACKGROUND AND FACTS[2]

In early December of 2019, Dianne Miller was in the process of purchasing a small

dwelling and acreage on Holland Road in Suffolk to build a community farm. She had not yet

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant does not raise any assignment of error relating to his convictions for robbery and credit card theft.

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

obtained title to the property, and there was no electricity, heat, or running water at the house. There was a generator at the property to provide limited electrical power.

Around this time, Miller met April White through Facebook. White needed a place to stay, and she asked for Miller's help. Miller agreed to let White and her boyfriend, Barber, live at the Holland Road property while Barber did some of the needed repairs. White was to pay Miller $300 in rent.

By December 18, 2019, White and Barber had been living at the property for about nine days without utilities, although Miller was trying to get electricity connected. During this time, Wendi Morrisette, a longtime friend of Miller's, allowed Barber and White to shower and eat at her house.

Following contentious text communication with Barber on the morning of December 18, Miller decided that the arrangement was not working, and she texted Barber that he and White had to leave the home. Barber then texted Morrisette, saying that he was angry at Miller for not getting the electricity connected. In those same messages, he threatened to beat Miller up. Miller then called Morrisette and asked her to come to the property with a truck to help White and Barber leave and to act as Miller's "witness." Morrisette did not mention the threats to Miller, stating that she had not taken them seriously.

Miller left work at around noon and went to Holland Road. After Miller and White exchanged angry words in the kitchen, Barber appeared and threw Miller through a door to the living room.[3] In doing so, Barber "ran [Miller's] head into the microwave enough to crack it." Miller hit the wall and fell to the living room floor. Barber got on top of her and was "pounding away." Barber punched Miller in the face repeatedly and told her that "today" she was "going to

---

[3] Barber was about six feet tall and weighed around 200 pounds. Miller was five feet and three inches tall and weighed 140 pounds.

die." Barber also choked her until she lost consciousness. During the attack, White took Miller's cell phone and destroyed it with a hammer.

When Miller regained consciousness, Barber was still on top of her, punching her repeatedly in the face and saying that she was going to die. In the background, White was encouraging Barber and saying, "Kill that bitch, today you die, bitch[.]" Miller was scared and unable to escape the assault. Miller blacked out several times while Barber continued to punch and choke her.

Barber then picked up Miller and sat her on a chair. Barber sat down on an overturned bucket facing Miller, threatened to kill her, and ordered White to bring him an extension cord and a knife. He said he was going to stab Miller, drag her outside, and leave her there so that the deer could eat her. After striking Miller again, he grabbed a necklace from her neck and demanded her ring. When Miller said no, Barber stated that "there was no God and he was God[,]" "she "was going to die that day," and he had "known for three days that he was going to kill" her. Barber ordered White to get a particular extension cord to tie up Miller; Barber said that he would stab her and "take her out back." White retrieved the extension cord that Miller demanded. While Miller feared that he was going to tie her up with it, she was never tied up.

At some point during the altercation, White called Morrisette. Based upon the commotion she heard in the background, Morrisette told White to call 911. Morrisette got in a truck and headed for the Holland Road property, which was about a twenty-minute drive from Morrisette's home.

During the attack, Barber told White to take Miller's wallet, which was attached to her pants with a chain. Barber yanked the wallet off Miller's pants and said that they were going to take all of her money. While threatening Miller and hitting her with a hammer, Barber

demanded that Miller reveal her PIN number for her bank cards.  Eventually, between blows, Miller revealed her PIN number.

At some point Barber's demeanor changed, and he began crying.  He said, "Look what you made me do."  Miller tried to calm him and told him she was sorry.  Barber then vacillated between being remorseful and threatening to kill Miller.

Morrisette arrived at the property and found Barber and Miller sitting in the living room face to face; Barber seated on a bucket.  Morrisette noticed a lump on the left side of Miller's forehead.  When Morrisette asked what had caused the injury, Barber said that Miller had fallen and hit a wall during a scuffle.  Miller shook her head in agreement.  Miller later testified that she did not say anything at that time about what Barber had done because she was afraid that he would also hurt Morrisette.

Morrisette told Barber to gather his belongings and get in her truck and that she would take him and White wherever they needed to go.  Miller got up and went to the bathroom.  She stated that she had intended to escape through it but was unable to because the window in the bathroom was nailed shut.

When Miller subsequently went outside, Barber was in her truck rummaging for documents relating to the electricity connection to the house.  Trying to calm the situation and end the confrontation, Miller helped Barber search for the documents in the truck.

While Barber was still searching the truck for the paperwork, Miller "mainlined it" across the four-lane highway to Kathy Birdsong's home.  Birdsong noticed that, when Miller arrived, her face was swollen and there was a knot to the side of one eye.  Miller was shaking and crying.  Miller said that she had been assaulted and someone tried to rob her.  Miller elaborated that someone hit her with a hammer and tried to tie her up.  Birdsong called 911.

Morrisette dropped Barber and White at a residence in Chuckatuck. The police arrested both of them at that residence later that day. White had two of Miller's debit cards in her possession, and Barber had her keys.[4] The police also recovered Miller's second cell phone.

Paramedics transported Miller to the hospital, where she received treatment for her injuries. The medical report indicates that she had a major facial contusion, blurred vision, a hoarse voice, and a very minor contusion on her neck, and the pictures depict a minor contusion to her right thigh. At the time of Barber's trial, Miller continued to have lingering muscle damage in her leg from blows with the hammer. She had recurring headaches and vision problems with her left eye. In addition, Miller suffered from post-traumatic stress disorder as a result of the attack.

Cindy Talmadge, Barber's mother, testified that he called her on the afternoon of December 18, 2019, and she heard a commotion in the background. Talmadge heard White's voice and that of another female. Talmadge heard more noises in the background for several minutes after Barber attempted to disconnect the phone. Talmadge admitted having prior felony convictions.

Barber was convicted of abduction to obtain pecuniary benefit, robbery, and two counts of credit card theft. In this appeal, he challenges only his conviction for abduction to obtain pecuniary benefit.

ANALYSIS

Under Code § 18.2-47(A), anyone who "by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty" is guilty of abduction. An abduction

---

[4] Miller later learned that Barber and White had used her debit card.

committed "with the intent to extort money or pecuniary benefit" is punishable as a Class 2 felony. Code § 18.2-48(i).

Barber argues that the evidence was insufficient to sustain his abduction conviction, contending that Miller's testimony was inherently incredible. On appeal, "[w]hen reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (second alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Pijor*, 294 Va. at 512). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Appellant asserts that Miller's testimony was inherently incredible and unworthy of belief. However, the jury accepted Miller's testimony with regard to the abduction offense. And the fact finder "who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019). When "credibility issues have been resolved by the jury," we will not disturb those findings "unless plainly wrong." *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13

Va. App. 296, 299 (1991)). Any "[p]otential inconsistencies in testimony are resolved by the fact finder." *Id.* at 292. Such conflicts are not revisited on appeal "unless 'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion.'" *Id.* (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006)).

This Court will not conclude that evidence was inherently incredible "unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). "[T]his Court cannot say a witness' testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

We find no basis to conclude that Miller's testimony was inherently incredible. Miller testified in great detail about how Barber attacked her and threw her to the floor. He held her there while he repeatedly punched and choked her. Eventually, Barber placed Miller in a chair and, after robbing her of personal items, hit her with a hammer to force her to reveal her bank card PIN. Once Morrisette arrived at the house, the situation de-escalated, and Miller had the opportunity to distance herself from Barber. While he was outside looking through her truck, Miller escaped by running across the street to Birdsong's home.

Miller's testimony did not stand in a vacuum, as appellant suggests. It was corroborated by Morrisette's testimony about what she observed upon arriving at the scene, and Birdsong's description of Miller's appearance and statements when she appeared at Birdsong's home. Moreover, Miller's injuries after the incident were consistent with her account of the violence

Barber inflicted upon her. Accordingly, Miller's testimony was not demonstrated to be inherently incredible.

While Barber only argues that there was a "reasonable doubt" about whether any abduction occurred at all, we observe that there was sufficient evidence that the abduction here was distinct from his other offenses. *See Vay v. Commonwealth*, 67 Va. App. 236, 250 (2017) (for abduction to be punishable as a separate offense it must be "separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime" (quoting *Brown v. Commonwealth*, 230 Va. 310, 314 (1985))).

Robbery is the "taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Jones v. Commonwealth*, 70 Va. App. 307, 316-17 (2019) (*en banc*) (quoting *Jay v. Commonwealth*, 275 Va. 510, 524 (2008)). "[A]n abduction generally inheres in a robbery because 'there is usually some detention, and often a seizure, of the victim'" to accomplish the taking. *Wiggins v. Commonwealth*, 47 Va. App. 173, 180 (2005) (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). When an accused takes property "from the presence of a person whose right to possession is superior to that of the [accused], the robbery is complete." *Lebedun v. Commonwealth*, 27 Va. App. 697, 718 (1998). Credit card theft, the other crime of which appellant was convicted, involves the taking of a credit card "from the person, possession, custody or control of another without the cardholder's consent." Code § 18.2-192(1)(a).

Barber argues that no detention occurred because he never carried through with his threat to tie up Miller with the extension cord, nor did he block any of the exits to the house during the attack or otherwise prevent her from leaving the property. Nonetheless, we find there was sufficient evidence to support the conclusion that appellant used force, and the threat of force, to detain Miller against her will both before, and after, the robbery offense was complete.

- 8 -

After Miller arrived at the house and argued with White, Barber threw her through a door, causing her to hit the microwave and wall and injure her head. Barber then held Miller down on the floor while he "pounded away" at her face with his fists and strangled her until she blacked out. In other words, Barber used force to detain Miller on the floor for a period of time, depriving her of her personal liberty.

Barber followed these actions by placing Miller in a chair, sitting opposite her, and telling her she was going to die. He threatened to stab her, tie her up with an extension cord, and leave her outside for deer to eat her. At that point, he yanked off her necklace, took the ring from her hand, and pulled her wallet off her pants. After taking Miller's property from her person, the robbery and the credit card theft offenses were complete.

But the violent attack did not cease. Barber continued to intimidate Miller and use force against her. He struck her with a hammer to force her to reveal her PIN so that he and White could use her debit card. Miller testified that she was afraid and could not move. Miller was only able to escape to a neighbor's house when Morrisette appeared at the home, diffusing the situation.

In this way, Barber detained Miller against her will with acts of force and intimidation that were separate from, and not merely incidental to, the robbery or credit card thefts. Accordingly, a reasonable finder of fact could conclude beyond a reasonable doubt that appellant was guilty of abduction.

CONCLUSION

For the foregoing reasons, we find the evidence was sufficient to support Barber's conviction for abduction, and we do not disturb the trial court's decision.

*Affirmed.*